**K N ENERGY, INC., Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

Western Gas Resources, Inc., Williston Basin Interstate Pipeline Company, Intervenors.

Nos. 90–1525, 90–1577.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 19, 1991.

Decided July 10, 1992.

John T. Miller, Jr., with whom B.J. Becker was on the brief, for petitioner K N Energy, Inc., in 90–1525.

Robert T. Hall, III, with whom Stephen L. Huntoon and Paul K. Sandness were on the brief, for petitioner Williston Basin Interstate Pipeline Co. in 90–1577 and intervenor in 90–1525. Randall V. Griffin also entered an appearance for petitioner.

Joel M. Cockrell, Atty., F.E.R.C., with whom William S. Scherman, Gen. Counsel, Jerome M. Feit, Sol., and Joseph S. Davies, Deputy Sol., were on the brief, for respondent.

Alan J. Roth, with whom Cynthia S. Bogorad, Douglas Eidahl, and Robert Nelson were on the brief, for intervenors Montana Consumer Counsel, et al. in 90–1525. Robin McHugh and Rise J. Peters also entered appearances for intervenors.

John B. Rudolph, Vera Callahan Neinast, and Lisa M. Tonery were on the brief for intervenor Western Gas Resources, Ltd.

Before EDWARDS, RUTH BADER GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

The ongoing struggle over the resolution of take-or-pay claims in the natural gas industry requires us to revisit the Federal Energy Regulatory Commission's ("FERC" or the "Commission") Order No. 500. 52 Fed.Reg. 30,334 (Aug. 14, 1987). This time we must determine whether the Commission may prohibit Williston Basin Interstate Pipeline Company ("Williston Basin") from allocating certain portions of its take-or-pay claims to its sales customers in a commodity rate surcharge, thus requiring the pipeline to spread its costs among transportation and sales customers on a volumetric basis. *See Williston Basin Interstate Pipeline Co.*, 52 FERC (CCH) ¶ 61,096 (July 27, 1990); *Williston Basin Interstate Pipeline Co.*, 53 FERC (CCH) ¶ 61,024 (Oct. 4, 1990).

This question devolves into three discrete inquiries: whether FERC may read its regulations to require such a result; whether the Natural Gas Act ("NGA") itself prohibits such a result, even if FERC's regulations do not; and whether the Commission has provided a reasoned basis for such a result with regard to a particular class of pipeline customers. We conclude that the Commission's decisions survive the first two inquiries, but fail on the third and, thus, require reversal and necessitate a remand.

I.

Williston Basin operates a natural gas pipeline in the four-state region of Montana, Wyoming, North Dakota, and South Dakota. Among its customers is fellow petitioner K N Energy, Inc. ("K N"), a company that engages Williston Basin's pipeline to transport its own natural gas supplies from a field in Montana to a site in Wyoming pursuant to a transportation and exchange service contract. Also among Williston Basin's customers is intervenor Western Gas Resources, Inc. ("Western"), a former § 7(c) customer now converted to open access.

We note at the outset that there are, in fact, three different sorts of pipeline customers: sales customers who purchase gas from pipelines; open access customers who, under FERC's emerging market-

based regime, transport their own gas through pipelines under one umbrella contract approved by FERC; and § 7(c) transportation customers such as K N who have been moving their own gas through pipelines for some time under individualized contracts approved and certified by FERC under § 7(c) of the NGA. 15 U.S.C. § 717f(c).

As both Williston and K N point out, this case continues the saga of the natural gas pipeline industry's transition from a merchant function to a transportation function. To understand how this latest chapter unfolds, however, it is necessary first to review a few of the more significant developments in the story line to date.

### A. The Continuing Take-or-Pay Saga

In 1985, FERC adopted Order No. 436, 50 Fed.Reg. 42,408 (1985), creating a set of "open access" regulations aimed at requiring interstate gas pipelines to transport natural gas owned by others on a nondiscriminatory basis, and overcoming pipelines' general refusal to move gas that would compete with their own sales. This court upheld much of Order No. 436, finding open access to be an important tool in the effort to create a more competitive gas market. See Associated Gas Distributors v. FERC, 824 F.2d 981, 994 (D.C.Cir.1987), cert. denied sub nom. Interstate Natural Gas Ass'n v. FERC, 485 U.S. 1006, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988) ("AGD I").

Though we approved the open access concept, we nonetheless vacated portions of Order No. 436 because FERC had failed to address some fundamental and pressing concerns—most notably the rule's effect on pipelines' take-or-pay problems. See AGD I, 824 F.2d at 1023–25. Take-or-pay problems had arisen from clauses in gas purchase contracts between pipelines purchasing—not merely transporting—gas and the producers of that gas. These clauses required pipelines "either to purchase a specified percentage of the producer's deliverable gas or to make 'prepayments' for that percentage anyway." Id. at 1021. Between 1977 and 1982, pipelines undertook

take-or-pay contracts at prices above then-current market levels, anticipating that the cost of gas would rise. This anticipation proved flatly wrong. By 1982, it had become painfully obvious that pipelines had committed themselves to prices well in excess of what the market actually required, resulting in a sunk cost for the pipeline industry of several billion dollars.

We held that the advent of a competitive open access system, while generally acceptable, would have "adverse consequences" on the pipelines' ability to solve their take-or-pay problems; in fact, it would make cost recovery through commodity rates "impossible." Id. at 1044. FERC's blindness to the possible impact of open access on the capacity of many pipelines to cover their take-or-pay costs while remaining economically viable was, we found, incompatible with our requirement of reasoned decisionmaking. Id. at 1025. Consequently, we remanded the take-or-pay issue, asking FERC to reconsider its treatment of this discrete transition problem, and noting that "candidates for th[e] dismal position" of bearing the cost of take-or-pay losses, included "[a]ll actors in the natural gas industry," except "fuel-switchable users, who can employ the cheapest fuel competing with gas and thus cannot be induced to pay more than the current competitive price." Id. at 1021.

FERC shortly thereafter issued Order No. 500. In it, the Commission recognized that "no one segment of the natural gas industry or particular circumstance appears wholly responsible" for the take-or-pay problem and, thus, that "all segments should shoulder some of the burden of resolving the problem." Order No. 500, 52 Fed.Reg. at 30,337. Accordingly, FERC provided that pipelines could continue to recover their take-or-pay costs either through the traditional sales commodity rate method or through a new "equitable sharing" mechanism. Equitable sharing dictated that if pipelines willingly absorbed between 25 and 50 percent of their take-or-pay costs, they could require their sales customers to match that amount in a fixed charge. Moreover, if any residuum remained (and there could be as much as 50

percent or as little as none), pipelines could recover it either through a commodity rate surcharge or a volumetric surcharge. FERC codified the equitable sharing principle announced in Order No. 500 at 18 C.F.R. § 2.104(a).

Upon review, we invalidated the fixed charge portion of Order No. 500. We did so because the charge was itself calculated by reference to the "purchase deficiency" method whereby a customer's purchases in years when take-or-pay liabilities were incurred was subtracted from that customer's purchases during a base period before take-or-pay liabilities. 18 C.F.R. § 2.104(b). Such a method of calculation, we found, stood in plain contradiction to the dictates of the filed rate doctrine. *Associated Gas Distributors v. FERC,* 893 F.2d 349, 355 (D.C.Cir.1989), *cert. denied sub nom. Berkshire Gas Co. v. Associated Gas Distributors,* —— U.S. ——, 111 S.Ct. 277, 112 L.Ed.2d 232 (1990) (*"AGD II"*).

In response, FERC has drawn up yet another set of guidelines governing allocation of take-or-pay costs to replace the defective Order No. 500. *See* Order No. 528, 53 FERC (CCH) ¶ 61,163 (Nov. 1, 1990). Petitions for rehearing of Order No. 528 are pending before the Commission, and a petition for judicial review has been filed with this court, but not yet heard. *Tennessee Gas Pipeline Co. v. FERC,* No. 91–1069 (D.C.Cir. filed Feb. 8, 1991).

## B. The Latest Chapter

The present problem arises under the now-replaced Order No. 500. The Commission continues to apply that scheme in the orders before us—rather than the new Order No. 528—because neither Williston Basin nor K N challenged the purchase deficiency methodology that resulted in our *AGD II* holding and the need for Order No. 528. While we might have expected the Commission to apply Order No. 528 across the field, we have not ordered it to do so.

In fact, the arguments petitioners raise today in no way revolve around the purchase deficiency mechanism. Rather, they focus narrowly on a separate component of the equitable sharing scheme: the commod-

ity rate surcharge mechanism. Petitioners object to both the fashion in which FERC has defined the scope of the surcharge and the justifications it has offered for its definition.

Following the announcement of Order No. 500, Williston Basin formulated a plan for resolving its take-or-pay costs requiring it to absorb 25 percent of these costs itself, forcing sales customers to pay another 25 percent (as calculated by means of the purchase deficiency method), and allowing it to recoup the remaining 50 percent through a surcharge based on its sales volume alone. *See Williston Basin Interstate Pipeline Company,* 52 FERC (CCH) ¶ 61,096 (July 27, 1990).

FERC accepted the first two components of Williston Basin's proposal, but rejected the third. It held that a commodity rate surcharge could only be based on total throughput. That is, if Williston Basin wanted to use the commodity rate surcharge mechanism, it could only recover from its sales customers an amount that reflected their percentage of total throughput; Williston Basin would have to absorb the portion of liability reflecting the usage of open access and § 7(c) transportation customers. FERC grounded its rejection of the Williston Basin plan in the language of § 2.104(a); in its view, that regulation required that both commodity rate and volumetric surcharges be based on total throughput. Subsequently, Williston filed—under protest—a revised tariff complying with the Commission's order. Under its new filing, Williston replaced its commodity rate surcharge with a volumetric surcharge, one taxing sales and transportation customers alike based on their actual usage.

K N, a transportation customer displeased with the Commission's ruling, joined Williston Basin in seeking a rehearing before the Commission and the reinstatement of the proposed commodity rate surcharge based on sales volume only. FERC denied rehearing, and petitioners filed for review in this court. Western intervened in support of various arguments raised by petitioner K N; the Montana

Consumer Counsel, the Montana Public Service Commission, and the Public Utilities Commission of South Dakota intervened in support of FERC.

## II.

Arguing that Williston Basin's proposed sales commodity rate surcharge is consistent with Order No. 500, and that the Commission's rejection of it was in error, petitioners raise three central arguments. First, they suggest that FERC's rejection of Williston Basin's tariff was based upon a misreading of its own regulation. Second, they argue that, if FERC did read its regulation rightly, the regulation itself is impermissible under the dictates of the NGA and traditional ratemaking principles. Petitioner K N finishes by submitting that, even if FERC read its regulation in an acceptable manner, and even if the regulation is permissible under the NGA, the Commission still erred in failing to offer a reasoned basis for the regulation's impact on § 7(c) transportation customers. We discuss each argument by turn.

### A. Parsing § 2.104(a)

■ Petitioners direct us to the specific language of the Commission's regulation implementing Order No. 500, in which FERC stated that

> [a]ny remaining costs [after absorption and the fixed charge] up to 50 percent of total buyout and buydown costs may be recovered *either* through a commodity rate surcharge *or* a volumetric surcharge on total throughput.

18 C.F.R. § 2.104(a) (emphasis added). In petitioners' view, the phrase "total throughput" modifies only the volumetric surcharge option; it has no bearing on the commodity rate surcharge option. Consequently, Williston Basin's proposed plan to force its sales customers to pay a full 50 percent of its take-or-pay costs through a commodity rate surcharge without reference to their actual percentage of total throughput is perfectly acceptable under the Commission's own regulatory scheme.

Petitioners also suggest that their view is consistent with previous FERC orders.

In *Transwestern Pipeline Co.*, 40 FERC (CCH) ¶ 61,324, 61,995 (Sept. 28, 1987), and elsewhere, petitioners contend, the Commission has recognized that pipelines have a right to recover up to 50 percent of their liabilities through a commodity rate surcharge; it has never hinted that reference to total throughput is necessary.

FERC responds with a different reading of § 2.104(a)'s language. It argues that the term "total throughput" modifies both the phrase "commodity rate surcharge" and the words "volumetric surcharge." Under this interpretation, of course, a pipeline does not have the option of allocating to sales customers all its take-or-pay liabilities remaining after absorption; instead, it may either shift all of those costs to both sales and transportation customers on a volumetric basis or allocate the costs to sales customers on a volumetric basis while assuming liability itself for that portion of total throughput attributable to transportation customers.

FERC also argues that *Transwestern* and the other orders on which petitioners rely do not support their position. *Transwestern* states simply that "remaining amounts, not to exceed 50 percent [may be recovered] ... through a commodity rate surcharge...." 40 FERC (CCH) at 61,995. According to FERC, there is nothing in that language to suggest that a pipeline is guaranteed recovery of the full 50 percent, or that reference to total throughput is unnecessary.

Undoubtedly, a grammarian would prefer Williston's parsing of § 2.104(a) to FERC's; it does seem as if "total throughput" might more naturally be read to apply to the volumetric option alone. That said, this court must be wary of invitations to engage in such wordly wars. Indeed, we are to defer to an agency's reading of its own regulations " 'unless it is plainly erroneous or inconsistent with the regulation.' " *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977) (quoting *Bowles v. Seminole Rock Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)). Our role is not to ensure that FERC's reading is the

most natural or the most logical, but only that it is " 'reasonable and consistent with the regulation.' " *National Trust for Historic Preservation v. Dole,* 828 F.2d 776, 782 (D.C.Cir.1987) (quoting *Belco Petroleum Corp. v. FERC,* 589 F.2d 680, 685 (D.C.Cir.1978)). An administrative agency should be accorded "even more deference in its interpretation of its own regulations than in the reading of its statutory mandate." *Puerto Rico Elec. Power Authority v. FERC,* 848 F.2d 243, 249 (D.C.Cir. 1988). *See also Lyng v. Payne,* 476 U.S. 926, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986); *Commonwealth Edison Co. v. U.S. Dep't. of Energy,* 877 F.2d 1042, 1045 (D.C.Cir. 1989); *Tallahassee Branch of the NAACP v. FCC,* 870 F.2d 704, 710 (D.C.Cir.1989).

Bearing our role in mind, there is no basis on which we might dismiss FERC's interpretation. Its view of how the phrase "total throughput" operates in § 2.104(a) is acceptable, even if the disinterested grammarian might prefer petitioners' position. Importantly, FERC's reading of that section is consistent with the purposes of Order No. 500, wherein the Commission stated that all firm sales customers "will be liable for both fixed and volume-based surcharges" and that "[i]nterruptible sales and transportation customers will be responsible *only for the volumetric charges depending on the volumes of gas sold or transported to them.*" Order No. 500, 52 Fed.Reg. at 30,344 (emphasis added). References to volume-based surcharges here appear to encompass both the commodity rate and volumetric mechanisms in § 2.104(a).

Moreover, there is no inconsistency between FERC's present reading of § 2.104(a) and the *Transwestern* decision. *Transwestern* does state that "up to 50 percent" of outstanding take-or-pay costs can be recovered through a commodity rate surcharge, but, as FERC notes, that order does not intimate that a full 50 percent recovery is assured.

Simply, there may be two ways to read how "total throughput" might operate in § 2.104(a). FERC has, however, offered one plausible explanation—one consistent with Order No. 500's general purposes and the Commission's prior precedent. It is not the province of this court to require more.

### B. Statutory and Precedential Arguments

Petitioners level an attack not only on FERC's interpretation of § 2.104(a), but also on its relationship to statutory and precedential authority. They argue that, as FERC reads the regulation, § 2.104(a) cannot be squared with the ratemaking principles found in the NGA and Commission caselaw.

Section 4 of the NGA is the touchstone in any legal analysis of FERC-approved rate schemes. Its spartan language requires only that rates be "just and reasonable." 15 U.S.C. § 717c(a).[1] Significantly, however, FERC and the courts have added flesh to these bare statutory bones, establishing what has become known in Commission parlance as the "cost-causation" principle. Simply put, it has been traditionally required that all approved rates reflect to some degree the costs actually caused by the customer who must pay them. As we stated in *Alabama Electric Cooperative, Inc. v. FERC,* 684 F.2d 20, 27 (D.C.Cir. 1982):

> While neither statutes nor decisions of this court require that the Commission utilize a particular formula or a combination of formulae to determine whether rates are just and reasonable, it has come to be well established that ... rates should be based on the costs of providing service to the utility's customers plus a just and fair return on equity. FERC itself has stated that "[i]t has been this Commission's long standing policy that rates must be cost supported. Properly designed rates should produce

---

1. 15 U.S.C. § 717c(a) provides in full:
   All rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful.

revenues from each class of customers *which match, as closely as practicable, the costs to serve each class or individual customer."*

(footnotes omitted) (emphasis retained).

Petitioners argue that, as regards Order No. 500's treatment of take-or-pay liability, FERC has abandoned the cost-causation principle. They submit that § 7(c) transportation customers did not—in any conceivable fashion—cause the take-or-pay crisis, but are asked, under the volumetric surcharge option, to help pay for its resolution.

FERC does not appear to dispute petitioners' analysis on this point. It has seemingly acknowledged that, in terms of cost-causation, those most responsible for the take-or-pay crisis are the pipelines themselves and their sales customers. *See, e.g., Natural Gas Pipeline Company of America*, 43 FERC (CCH) ¶ 61,194, 61,515 (Apr. 29, 1988).[2] Further, on rehearing the Commission itself failed even to dispute "the premise that the transportation customers did not cause the incurrence of the costs." *Williston Basin Interstate Pipeline Co.*, 53 FERC (CCH) at 61,094.

▮ FERC has instead taken the position that circumstances surrounding the take-or-pay crisis and the transformation of the pipeline industry necessitate and justify the crafting of new ratemaking principles. FERC has, thus, replaced cost-causation as the operative ratemaking rationale under Order No. 500 with two new principles: a cost-spreading concept and a "value-of-service" concept. Under the first notion, allocating take-or-pay costs to transportation customers who admittedly may not have directly caused them is acceptable because, in the Commission's judgment, the extraordinary nature of this problem requires the aid of the entire industry to solve it; there are no other alternatives that would allow a transition to a market-based pipeline industry to be effectuated. Closely related to this rationale is FERC's second: namely,

that all segments of the industry—including those who may not have caused take-or-pay problems—will nonetheless ultimately benefit from their resolution and the concomitant move toward an open access regime; consequently, all segments can rightly be assessed a portion of take-or-pay costs.

Petitioners ask us to invalidate Order No. 500 to the extent it would allow recovery from § 7(c) transportation customers based on these rationales. In their view, a cost-spreading and benefit-based ratemaking scheme cannot be squared with FERC's statutory mandate to impose only "just and reasonable" rates.

We cannot oblige petitioners on this score. This court has already made plain in the language of *AGD I*, and our actions in *AGD II*, that the ratemaking rationales of Order No. 500 can be reconciled with the NGA, given the unusual circumstances surrounding the take-or-pay problem, and the limited nature—both in time and scope—of the Commission's departure from the cost-causation principle. FERC rightly notes that this court remanded Order No. 436 on the grounds that FERC needed to spread take-or-pay costs more broadly than it had proposed. We there made plain that *"[a]ll actors in the natural gas industry"* are proper "candidates" for absorbing take-or-pay liability, except likely fuel-switchers. *AGD I*, 824 F.2d at 1021 (emphasis added). This is because, as we explicitly acknowledged, pipelines might be unable to recover their costs solely from sales customers who, under an open access regime, can readily switch to other suppliers. Likewise, by setting aside the Commission's purchase deficiency allocation method for assigning the fixed charge in *AGD II*—a mechanism meant to match cost responsibility with cost incurrence as closely as possible—this court declined to suggest that FERC was forbidden from temporarily foregoing a cost-causation analysis in order to resolve the take-or-pay problem.

---

**2.** In *Natural Gas Pipeline Company of America*, 43 FERC (CCH) at 61,515, FERC explained:

Because buyout and buydown costs are expenses related to the acquisition of gas supply,

the recovery mechanism that the Commission has found to be most appropriate for pipelines to use is [sales] commodity rate treatment for all such prudently incurred costs.

In the long haul, Order No. 500 may represent only a minor departure from the cost-causation principle; indeed, the benefit principle may simply prove to be another prism through which to view the question of cost causation—one that admittedly extends the chain of causation further than FERC has done traditionally. That is, rather than focusing us on the most immediate and proximate cause of the cost incurred, the benefit principle may only ask us to look at a host of contributing causes for the cost incurred (as ascertained by a review of those who benefit from the incurrence of the cost) and assign them liability too. Simply, it may be a proxy for an extension of the chain of causation.

Intervenors Montana Consumer Counsel, Montana Public Service Commission, and the Public Utilities Commission of South Dakota (the "utility intervenors") point out that FERC and this court have employed a rather broad view of causation in the past—perhaps one as broad as that proposed here. For example, a pipeline may decide to enlarge or extend its facilities in order to serve a major new customer; we have held that, if those facilities are potentially useful to existing customers, the cost may be rolled into the rate base of all pipeline customers without violating the cost-causation principle, on the grounds that "all customers enjoy the benefits" of the entire system. *Battle Creek Gas Co. v. FPC*, 281 F.2d 42, 46 (D.C.Cir.1960).

We see no need to explore further the Commission's power to impose rates based on cost-spreading and value-of-service rationales. A more searching inquiry may well prove necessary when Order No. 528 comes before this court, or if the Commission should attempt to adopt these ratemaking rationales outside the take-or-pay context. Indeed, we do not purport to suggest the proper outcome in such cases. We hold only—and quite narrowly—that in the context of Order No. 500 the Commission has not betrayed its obligations to the NGA or precedent by employing these ratemak-

ing principles in its attempt to bring closure to the take-or-pay drama.

### C. Section 7(c) Transportation Customers and the Reasoned Decisionmaking Requirement

█ Though Williston Basin here ends its objections to the Commission's orders on review, K N presses on.[3] K N suggests that, even if FERC read its rule rightly, and even if that rule is tenable in the abstract, the Commission has nonetheless failed to demonstrate a meaningful connection between the rationales behind Order No. 500 and the particular circumstances of § 7(c) transportation customers. Put another way: even if FERC could use Order No. 500's cost-spreading and benefit rationales as legitimate bases for ratemaking, K N submits that FERC has not—to date—done an adequate job of explaining and justifying why and how those rationales apply to § 7(c) transportation customers. On this limited point, we agree.

To begin, the Commission has stated that § 7(c) transportation customers benefit from—and thus should help pay for the creation of—an open access regime because open access will result in increased pipeline throughput; given traditional economic theory, one might expect increased throughput to "translate into lower per unit transportation costs, since fixed costs will be spread over increased volumes." *Williston Basin Interstate Pipeline Co.*, 53 FERC (CCH) at 61,094. However, as petitioners point out, the price of § 7(c) transportation service has not decreased on the Williston Basin system, but has actually increased since open access was initiated. *See* Separate Initial Brief of Petitioner K N Energy, Inc. at 25–26. FERC makes little effort to grapple with this fact in the orders on review. Indeed, in its brief to this court, FERC races by K N's point, arguing primarily that, "[i]n any event," other benefits do accrue to § 7(c) transportation customers. *See* Brief of Respondent at 19.

---

**3.** Williston Basin not only ends its objections to FERC's orders here, but, in fact, supports FERC

on this last point.

While we owe the Commission substantial deference in matters predictive and economic, *see, e.g., Black Citizens for a Fair Media v. FCC,* 719 F.2d 407 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1255, 104 S.Ct. 3545, 82 L.Ed.2d 848 (1984); *Community Nutrition Institute v. Young,* 773 F.2d 1356 (D.C.Cir.1985), *cert. denied,* 475 U.S. 1123, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986), we cannot ignore the Commission's unwillingness to address an important challenge to its stated benefit rationale for charging transportation customers. It most emphatically remains the duty of this court to ensure that an agency engage the arguments raised before it— that it conduct a process of *reasoned* decisionmaking. The deference we owe FERC's expert judgment does not strip us of that responsibility. *See, e.g., American Mining Congress v. U.S. EPA,* 907 F.2d 1179, 1187 (D.C.Cir.1990) (emphasizing that deference to an agency's judgment does not relieve a reviewing court of its responsibility to ensure that the agency has articulated a satisfactory explanation for its action). Indeed, as we stated in *Neighborhood TV Co. v. FCC,* 742 F.2d 629, 639 (D.C.Cir.1984), we will uphold an agency's decision "if, but only if, we can discern a reasoned path from the facts and considerations before the [agency] to the decision it reached."

FERC attempts to patch the gaping hole in its benefit rationale by arguing that "[i]n any event" benefits beyond decreased cost might accrue to § 7(c) transportation customers from the advent of open access. Specifically, it notes that § 7(c) customers now have the option of converting their service into open access service, and, further, that they may need to do so if the transporting pipeline were ever to obtain Commission authorization for abandoning its contract. Brief of Respondent at 19–20.

This recitation of additional benefits, coming for the first time in the Commission's brief to this court, cannot save the Commission's order. It is a well-established and equally wise principle that "courts may not accept appellate counsel's *post hoc* rationalizations for agency action; [*Securities & Exchange Comm'n v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947) ] requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself." *Burlington Truck Lines v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962).[4]

FERC's attempt to explain the application of its cost-spreading rationale in this case is as unsatisfying as its attempt to suggest a cognizable benefit. Petitioners point out that the Commission continues, despite Order No. 500, to allow interested pipelines to allocate all their take-or-pay costs to sales customers through the traditional sales commodity charge, *viz.* by rolling costs into their sales commodity rate. However, once a pipeline agrees to absorb a portion of its take-or-pay costs under Order No. 500, it suddenly becomes impermissible to allocate the full balance to the same sales customers under the Commission's reading of § 2.104(a). The result is, as petitioners argue, a serious problem for the Commission's cost-spreading rationale. Why, they sensibly ask, is allocation of all costs to sales customers under one scheme consistent with a cost-spreading principle, but allocation of only 75 percent of costs under another somehow incompatible with that same rationale?[5] The Commission attempts no answer.

It strikes us that, though the Commission can permissibly read § 2.104(a) in the

---

**4.** The utility intervenors suggest that, even if rates for service to K N have risen since the advent of open access, they would have risen even more without open access and, thus, K N does benefit in some fashion. Brief of Utility Intervenors at 6. This is an interesting suggestion—one that FERC could consider on remand. Yet, it cannot save the orders now before us as, again, the Commission itself failed to explain or rely upon this reasoning in reaching its decision.

**5.** Williston Basin's original proposal to the Commission would have the pipeline absorb 25 percent of take-or-pay costs, and have sales customers pay 25 percent in a fixed charge and the remaining 50 percent in a commodity rate surcharge.

fashion it does, it must provide some reasons for the resulting difficulty it creates in its cost-spreading rationale, or perhaps fashion additional options for pipelines to utilize. In any event, as it functions now, the Commission's cost-spreading rationale fails, as its benefit rationale does, to satisfy the basic requirements of reasoned decisionmaking.

In sum, charging § 7(c) transportation customers with some portion of take-or-pay costs under the ratemaking rationales embodied in Order No. 500 is not inherently inconsistent with the requirement of reasoned decisionmaking. The orders now before us do not, however, reflect such decisionmaking. Consequently, we must vacate and remand them to the Commission.[6]

### III.

We grant only K N's separate petition for review regarding FERC's inadequate explanation of how its benefit and cost-spreading rationales apply to § 7(c) transportation customers. We, thus, remand the orders on review for a clear statement from the Commission on how its ratemaking rationales apply to these customers.

*It is so ordered.*

**6.** K N further claims that the Commission acted outside the scope of its statutory authority by allowing Williston Basin to impose a volumetric surcharge on K N without a 30–day notice period as required by § 4(d) of the NGA. Because we reverse the surcharge on K N's § 7(c) transportation service, we need not reach the issue of when such a surcharge might properly become effective.

K N also suggests that the Commission lacks the authority under § 5 of Williston Basin's filed contract with K N to make rate changes not specifically requested by Williston Basin. Again, however, we need not answer this question, as we have found the alleged "rate change" problematic on other grounds.