**NORAM GAS TRANSMISSION COMPANY, Petitioner,**

**v.**

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**City of Clarksville, Tennessee, et al., Intervenors.**

**No. 97–1101.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 19, 1998.

Decided July 31, 1998.

Richard D. Avil, Jr. argued the cause for petitioner, with whom Martin V. Kirkwood, Jason F. Leif and Sherrie N. Rutherford were on the briefs.

John H. Conway, Deputy Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent, with whom Jay L. Witkin, Solicitor, and Janet Kay Jones, Attorney, were on the brief.

Jeffrey D. Komarow argued the cause for intervenor Tennessee Gas Pipeline Company, with whom Michael J. Thompson was on the brief. Michael J. Fremuth entered an appearance.

Before: WALD, SENTELLE and RANDOLPH, Circuit Judges.

SENTELLE, Circuit Judge:

NorAm Gas Transmission Co. ("NorAm") petitions for review of an order issued by the Federal Energy Regulatory Commission ("FERC" or "the Commission") approving a contested settlement filed by Tennessee Gas Pipeline Co. ("Tennessee"), and of an order denying NorAm's request for rehearing. In the proceedings before the agency, NorAm objected to the proposed settlement on the grounds that Tennessee's rate structure, which allocates costs based on a system-wide average, would have an anticompetitive effect on the formation of market centers, in contravention of Order No. 636. Because we conclude that the Commission failed to provide a reasoned response to NorAm's objection, we grant the petition for review.

I.

A. Regulatory Landscape

Beginning with the enactment of the National Gas Policy Act, Pub.L. No. 95–621, 92 Stat. 3350 (1978) (codified as amended at 15 U.S.C. § 3301 *et seq.* (1994)), the Commission undertook a substantial restructuring of the natural gas industry, with the goal of allowing market forces to play a greater role in determining the supply, demand, and price of natural gas. We have set forth comprehensive histories of this process on prior occasions and have no need to rehash it now. *See United Distribution Cos. v. FERC*, 88 F.3d 1105 (D.C.Cir.1996) (*"UDC"*). This decade-long effort culminated in Order No. 636, Pipeline Service Obligations and Revisions to Regulations Governing Self–Implementing Transportation; and Regulation of Natural Gas Pipelines After Wellhead Decontrol, F.E.R.C. Stats. & Regs. (CCH) ¶ 30,939, *order on reh'g*, Order No. 636–A, F.E.R.C. Stats. & Regs. (CCH) ¶ 30,950, *order on reh'g*, Order No. 636–B, 61 F.E.R.C. (CCH) ¶ 61,272 (1992), *aff'd in part, rev'd in part*, *UDC*, 88 F.3d at 1105, *cert. denied*, —— U.S. ——, 117 S.Ct. 1723, 137 L.Ed.2d 845 (1997), *order on remand*, Order No. 636–C, 78 F.E.R.C. ¶ 61,186 (1997). In Order No. 636, the Commission sought to "complete the evo-

lution to competition in the natural gas industry." Order No. 636, ¶ 30,939, at 30,391. We upheld the Commission's effort with minor exceptions in *UDC*.

Prior to the restructuring, pipelines had performed both a merchant and a transportation function. That is, they typically engaged in "bundling," selling to each customer both the required quantity of natural gas and transportation service bringing that gas from the production area to the customer's point of purchase. *See UDC*, 88 F.3d at 1125–27. In the process of restructuring, the Commission concluded that bundling discouraged the sale of gas by non-pipeline sellers. *Id.* The Commission sought to remedy this "market power" situation and to establish a new regime ensuring "that all shippers have meaningful access to the pipeline transportation grid so that willing buyers and sellers can meet in a competitive, national market to transact the most efficient deals possible." Order No. 636, ¶ 30,939, at 30,393. To achieve that goal the Commission required pipelines to "unbundle," sell transportation services separately from gas, and thereby become primarily transporters as a competitive market developed for the merchant function.

The Commission foresaw the competitive market developing geographically not only in production areas *per se*, but also in areas "where the pipelines intersect to create a market for gas purchasers from different market areas." Order No. 636, ¶ 30,939, at 30,427; *see also* Order No. 636–B, ¶ 61,272, at 62,012 (discussing areas where pipelines interconnect and where "there is a reasonable potential for developing a market institution that facilitates the free interchange of gas"). The Commission intended that market centers would "enhance the efficient operation of the natural gas market and aid competition by creating markets where gas sellers from different production areas can meet gas purchasers from different market areas using different pipelines." Order No. 636–A, ¶ 30,-950, at 30,581. The Commission did not attempt to mandate the creation of market centers, but rather expected that they would develop naturally, according to the dictates of the marketplace. Order No. 636, ¶ 30,939, at

30,427–28. The Commission therefore revised its regulations to prohibit pipelines from imposing tariffs that inhibit the development of market centers. *Id.*; *see* 18 C.F.R. §§ 284.8(b)(4), 284.9(b)(4). As the Commission explained, a pipeline's rate structure can impede the development of market centers in a number of different ways:

> Rate structures can inhibit market centers when (for instance) they require shippers to pay for substantial amounts of capacity both upstream and downstream of a market center in order to use only the upstream or downstream part of the pipeline. Postage stamp rates and rates based on large zones can have this effect. Similarly, rates can inhibit market centers when a pipeline charges a large zone rate simply to transfer gas among two other nearby pipelines within a market center. In both cases, the result amounts to tying transportation services together that are commercially distinct and is contrary to the spirit of service unbundling.

Order No. 636–B, ¶ 61,272, at 62,012.

### B. Factual Background

Tennessee owns and operates an extensive natural gas pipeline system that runs in a northeasterly direction from the southern Texas–Gulf Coast area to New England. Tennessee's pipeline network is divided into seven zones, numbering from 0 to 6. NorAm operates a smaller transmission system, which is confined to a handful of states just north of the Gulf region. NorAm's pipelines interconnect with Tennessee's lines at Perryville, Louisiana, which is located in the middle of zone 1 of Tennessee's system.

On December 30, 1994, Tennessee filed tariff sheets proposing an increase of $117.9 million in its overall cost of service. In the new tariff sheets Tennessee maintained its existing practice of basing its transmission rates on a systemwide cost of service. Under this structure, costs are allocated to rate zones and to classes of customers based on a systemwide average of all mainline transmission costs in all of the zones, rather than by calculating a separate cost of service for each particular rate zone. *See Tennessee Gas*

*Transmission Co.*, 27 F.P.C. 202 (1962). At least two other methods of allocating cost of service in the design of rates are available to pipelines: the "postage stamp" rate design, *see Northwest Pipeline Corp.*, 82 F.E.R.C. ¶ 61,158 (1998); and the "zone gate" method, *see Williams Natural Gas Co.*, 77 F.E.R.C. ¶ 61,277 (1996). The first is not distance sensitive, and the second treats each zone as a separate operating entity for purposes of cost allocation.

Seventy-nine parties, including customers and state utility commissions, intervened in the proceeding, objecting to the proposed increase in costs, to the proposed rate of return on equity, and to the design of Tennessee's transportation rates and zone structure. After a preliminary review, the Commission accepted and suspended the filing, subject to refund. The Commission concluded that Tennessee's proposal raised a number of issues under the National Gas Act, and ordered that an Administrative Law Judge ("ALJ") convene an expedited public hearing on the lawfulness of the proposed rates.

Following discovery and the filing of testimony, the parties began settlement negotiations, which ultimately led to the submission of a settlement offer to the ALJ pursuant to Rule 602(b). 18 C.F.R. § 385.602(b). NorAm opposed the proposed settlement and filed comments and a brief affidavit. NorAm's basic objection was that Tennessee's zone structure, rate design, and cost allocation system would have an anticompetitive impact and would be inconsistent with Order No. 636. Specifically, NorAm stated that Tennessee had a defined "production area," which consisted of all of zone 0 and part of zone 1, as well as a defined "market area," representing the remainder of Tennessee's rate zones. NorAm alleged that Tennessee's production area costs were being unlawfully "bundled" with its market area costs, so that shippers using only Tennessee's market area zones were in effect paying a portion of the costs of Tennessee's production area facilities that they did not use. NorAm further alleged that this "bundling" of costs inhibited the development of market centers downstream of Tennessee's production area. As a remedy, NorAm proposed that the Commission require Tennessee to: (1) create a separate rate zone in Tennessee's production area; (2) develop a separate cost of service for Tennessee's production area; and (3) unbundle its production area costs from its market area rates. *Initial Comments of NorAm Gas Transmission Company in Opposition to Settlement Offer, Tennessee Gas Pipeline Company,* FERC Docket No. RP95–112–000 (*"Initial Comments"*). After receiving reply comments from Tennessee, and other parties, the ALJ issued an order certifying the settlement to the Commission for determination as a contested settlement under 18 C.F.R. § 385.602(h).

On October 30, 1996, the Commission issued an order accepting the proposed settlement. *Order on Contested Settlement,* 77 F.E.R.C. ¶ 61,083, at 61,353 (1996). In its order, the Commission addressed NorAm's argument that Tennessee should be required to develop a separate rate structure for the production area. The Commission reaffirmed its policy of allowing a system-wide cost of service for long-line pipelines:

> [T]he Commission's general policy is to design rates for this type of long-line pipeline based upon the use of a system-wide cost of service. Service on such pipelines cannot generally be attributed to specific facilities. For that reason, it is difficult to attribute the benefits of a limited portion of the system to only one type of service. For reasons such as these the Commission historically refrained from dividing up the cost of service by zone, but rather, has utilized a system-wide cost of service.

*Id.* at 61,359 (quoting *Transcontinental Gas Pipe Line Corp.*, Opinion No. 405, 76 F.E.R.C. ¶ 61,021, at 61,070 (1996)). NorAm's argument, the Commission continued, was based upon the notion that a system-wide cost of service is *"per se* unjust and unreasonable" simply because some customers end up paying costs for production facilities that they do not use. The Commission responded once again by quoting from Opinion No. 405: "The Commission's general policy is that a customer should pay for costs that are properly allocated to the service that it receives. This does not mean that a customer must pay only for the book construc-

tion costs of the facilities through which the gas flows or that no production area costs may be charged to the market area." *Id.* The Commission ended with the point that a proper allocation of costs on a system-wide basis could actually *increase* costs in the production area by "rolling in the costs of facilities located solely in the downstream end of the pipeline." *Id.*

NorAm requested rehearing, faulting the Commission for failing to respond to its argument that Tennessee's cost allocation and rate design mechanisms inhibit the development of market centers in a manner prohibited by Order No. 636 and by the Commission's regulations. NorAm reiterated that Tennessee's rate structure forced certain market area customers to pay for production area facilities that they do not use, because Tennessee's system does not separate production area costs and market area costs. *Request for Rehearing of NorAm Gas Transmission Company, Tennessee Gas Pipeline Company,* FERC Docket No. RP95–112–000 ("*Request for Rehearing*").

The Commission ultimately denied NorAm's request for rehearing. *Order Denying Rehearing,* 78 F.E.R.C. ¶ 61,069, at 61,253 (1997). The ·Commission began by repeating that "there is no *per se* violation of any Commission policy with Tennessee's continued, long-standing use of a system-wide cost-of-service." *Id.* at 61,255. Because Tennessee's overall rate structure was "consistent with Commission precedent rejecting proposals to create separate costs-of-service for production and market areas," NorAm had the burden of demonstrating, through specific facts, that Tennessee's particular cost allocation scheme was unjust and unreasonable. The Commission concluded that NorAm could not meet this burden simply by showing that a separate rate for the production area *could* be calculated. *Id.* at 61,254–55.

After reiterating its point about the "pay for what you use" policy, the Commission revisited NorAm's argument that Tennessee's cost allocation system results in "bundling" of market and production area costs in violation of Order No. 636. The Commission explained that Order No. 636 required the

unbundling of the transmission function from the sales function, but did not go so far as to require pipelines to develop separate rates for the production area and the market area. *Id.* at 61,255.

Finally, FERC addressed NorAm's contention that "the Commission did not adequately address its arguments concerning production area rates and their relationship with market centers," *id.* at 61,255–56, in a response which NorAm still contends was far from adequate.

NorAm filed a timely petition for review.

## II.

▮ In general we review final decisions of the Commission under the deferential arbitrary and capricious standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Under that standard, we must uphold a decision of the Commission unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* Specifically, in reviewing the Commission's approval of a contested settlement, we must determine whether the Commission has supplied a "reasoned decision" that is supported by "substantial evidence." 18 C.F.R. § 385.602(h)(1)(i) (1997).

In its petition for review, NorAm contends that (1) the Commission failed to give a reasoned response to its market center argument; and that (2) the Commission's decision not to deal with its market center objection infected its entire decision. We agree with the former contention, but find it unnecessary to reach the latter.

## A.

NorAm argues that the Commission never gave serious consideration to its "marketplace" challenge. NorAm has taken the position both before the Commission and on petition for review, that Tennessee's zone structure, rate design, and cost allocation discourage the formation of market centers, in contravention of Order No. 636 and the Commission's regulations. In its initial comments in opposition to the settlement offer, NorAm argued that "the bundling of production area facility costs with Tennessee's mar-

ket area rates inhibits the competition that should develop at the market centers where competing pipelines interconnect with Tennessee." *Initial Comments*, at 3. The combination of production area and market area costs, NorAm alleged, acts "as a disincentive for those shippers that wish to explore access to alternative sources of gas supplies because they are required to pay for Tennessee's production area facilities whether or not they use those facilities." *Id.* at 7. In NorAm's view, this rate structure inhibits the formation of market centers because it " 'require[s] shippers to pay for substantial amounts of capacity both upstream and downstream of a market center in order to use only the upstream or downstream part of the pipeline.' " *Id.* at 8 (quoting Order No. 636–B, ¶ 61,272, at 62,012).

In its order accepting the proposed settlement, the Commission addressed a number of arguments advanced by NorAm, but did not mention NorAm's market center objection. *Order on Contested Settlement*, at 61,-359. NorAm, in its petition for rehearing, faulted the Commission for "never respond[ing] to [the] argument that Tennessee's cost allocation and rate design mechanisms inhibit the development of market centers and competition in a manner prohibited by Order No. 636." *Request for Rehearing*, at 1. NorAm went on to explain, once again, its position that Tennessee's rate scheme discourages the creation of market centers. *Id.* at 4–9.

In the order denying rehearing, the Commission devoted only a few lines to NorAm's market center objection. The Commission briefly addressed NorAm's point that Tennessee's rate system disrupts competition at potential market centers by forcing certain customers to pay for production area facilities that they do not use, by responding simply that NorAm misunderstood the "pay for what you use" policy. It explained that there is no rule providing that " 'a customer must pay only for the book construction costs of the facilities through which the gas flows or that no production area costs may be charged to the market area.' " *Order Denying Rehearing*, at 61,255 (quoting *Transcontinental Gas*, 76 F.E.R.C. ¶ 61,021, at 61,-

071). The Commission briefly returned to the issue of market centers in a later passage, observing that "this case is not the appropriate forum" to address NorAm's arguments "concerning production area rates and their relationship with market centers." The Commission explained that it "attaches little weight, when considering a proposed settlement that is supported by all-customer-parties, to opposition expressed by a competitor of the pipeline. This is because the Commission is not interested in rejecting a proposed settlement for the purpose of protecting or enhancing the competitive position of a competitor." *Id.* at 61,255–56 (quoting *Kern River Gas Transmission Co.*, 70 F.E.R.C. ¶ 61,072, at 61,179 n. 15 (1995)).

In its petition for review, NorAm argues that the Commission did not engage in reasoned decisionmaking when it rejected its market center objection. NorAm contends that it presented evidence that Tennessee's rate structure was inconsistent with Order No. 636 and the Commission's regulations because it inhibited the development of market centers at potential sites such as Perryville. NorAm argues that the Commission did not give a rational response to this objection, because it did not attempt to explain how NorAm's evidence was insufficient, or how NorAm's system was faithful to the Commission's policies. We agree.

■ NorAm repeatedly objected to the settlement offer on the grounds that Tennessee's rate structure would discourage the development of market centers. The Commission did not address this argument at all in its initial order, and mentioned it in the order denying rehearing only by summarily rejecting it. In the latter order, the Commission twice noted the existence of NorAm's market center argument, but failed both times to address the objection. The Commission first skirted the issue, offering a general explanation of its "pay for what you use" policy, without grappling with NorAm's point that Tennessee's cost structure would have an anticompetitive effect on potential market centers. The Commission's principal response was to deny the need to answer NorAm's objection at all. In explicit terms, the Commission refused to confront the mar-

ket center objection, simply because the point was raised by a competitor of Tennessee, rather than by one of its customers. The Commission found support for this non-responsive posture in *Kern River*, in which the Commission made the passing observation, in a single footnote, that objections by competitors are entitled to less weight.

The Commission's response is unacceptable at a number of levels. First, *Kern River* does not remotely validate such deliberate indifference to the concerns raised by a competitor. The passage quoted by the Commission states that arguments by competitors are entitled to "little weight," not that they may be wholly disregarded simply because they originate with a competitor. Moreover, the Commission quoted selectively from this passage in *Kern River*, which goes on to say that, "[o]f course, the Commission would be concerned if serious questions were raised about the competitive effects of a proposed settlement." *Kern River*, at 61,179 n.15. Unlike the challenger in *Kern River*, who made "no attempt to show that approval of this Settlement would somehow harm competition," *id.*, NorAm did argue that Tennessee's system in the proposed settlement would hinder competition at potential market centers. The Commission cannot successfully contend that NorAm did not raise "serious questions" about the competitive impact of the proposal. In the order approving Tennessee's proposed settlement, the Commission recognized that market centers provide services that are "critical for ensuring growing competition in the industry," and that market center trading is even "more crucial to the development of a seamless, efficient North American market than was envisioned in Order No. 636." *Order on Contested Settlement*, at 61,357. Given the importance of market centers to the efficient operation of the natural gas industry, the Commission could not turn a blind eye towards NorAm's argument, notwithstanding the fact that NorAm also sells natural gas.

On a broader level, the notion of disregarding arguments simply because they are made by competitors is contrary to specific goals of Order No. 636. In that order, the Commission decided that the existing regulatory regime gave a competitive advantage to pipeline sellers, to the detriment of both consumers and non-pipeline sellers of natural gas. Order No. 636, ¶ 30,939, at 30,398–06. The Commission dealt with that problem by requiring a number of changes in the natural gas industry so that "all natural gas suppliers, including the pipeline as merchant, will compete for gas purchasers on an equal footing." *Id.* at 30,391. By removing artificial barriers to competition, the Commission hoped to "establish a well-functioning national gas market that would permit customers to move gas seamlessly across pipelines in a national grid." *Order on Contested Settlement*, at 61,356–57.

In this case, NorAm argues that Tennessee's rate structure, which combines production area and market area costs, disrupts the efficient operation of the natural gas market, because it requires purchasers to pay the costs of production facilities that they do not use. NorAm argues that competitors such as itself will suffer direct and tangible harm if Tennessee's rate scheme inhibits the creation of market centers. In order to reach markets in the Midwest and Northeast, NorAm argues, it must be able to take advantage of the seamless national pipeline grid envisioned by Order No. 636. If, as NorAm alleges, Tennessee's proposal would frustrate the development of market centers at potential sites such as Perryville, then competitors such as NorAm would be deprived of the ability to compete on a level playing field with Tennessee for sales in other geographic markets. Given that a primary goal of Order No. 636 was to create "a regulatory environment in which no gas seller has a competitive advantage over another gas seller," Order No. 636, ¶ 30,939, at 30,393, it was incumbent upon the Commission, when considering the settlement offer, to give serious consideration to the alleged anticompetitive effects of Tennessee's rate system.

█ In the order denying rehearing, the Commission seemed to justify its dismissive stance toward the market center argument by making reference to the fact that the proposed settlement was "supported by almost all of Tennessee's customers." *Order Denying Rehearing*, at 61,255–56. As we

have explained before, the Commission is clearly entitled to give weight to the support of customers when deciding whether to approve a settlement offer. *Laclede Gas Co. v. FERC,* 997 F.2d 936, 946 (D.C.Cir.1993). However, customer support is not dispositive, even when a settlement offer is uncontested. Even if Tennessee's customers had unanimously supported the proposed settlement, the Commission would still have the responsibility to make an independent judgment as to whether the settlement is "fair and reasonable and in the public interest." 18 C.F.R. § 385.602(g)(3); *see also Laclede Gas,* 997 F.2d at 946. Although the Commission may take widespread customer support into account, such support is not an excuse to ignore arguments raised by a competitor who opposes the settlement.

■ As a last-ditch effort, counsel for FERC attempts to provide a rationale for the Commission's rejection of NorAm's market center argument. We are told, for example, that most of NorAm's evidence was stricken by the ALJ, that Order No. 636 does not mandate the creation of market centers, and that Tennessee's rate structure does not match any of the Commission's examples of rates that inhibit market centers. Tennessee, as intervenor, attempts to shore-up this effort by offering economic arguments as to why the rate structure is not in fact anticompetitive. Unfortunately for the Commission, an administrative order "must stand or fall on the grounds articulated by the agency" in that order. *Algonquin Gas Transmission Co. v. FERC,* 948 F.2d 1305, 1312 n. 12 (D.C.Cir.1991) (citing *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)). Because the Commission did not reject NorAm's market center argument on any of the grounds which it and the intervenor now offer, none of these arguments can save the orders under review.

In previous cases, we have rejected agency orders when the Commission neglected to deal with an important part of the problem, or otherwise failed to offer an adequate explanation for a particular decision. *See, e.g., Laclede Gas,* 997 F.2d at 945–48; *North Carolina Util. Comm'n v. FERC,* 42 F.3d 659 (D.C.Cir.1994). In the present case, the Commission not only failed to provide an adequate response to NorAm's argument, it failed to take seriously its responsibility to respond at all. As we have said before, "[i]t most emphatically remains the duty of this court to ensure that an agency engage the arguments raised before it—that it conduct a process of *reasoned* decisionmaking." *K N Energy, Inc. v. FERC,* 968 F.2d 1295, 1303 (D.C.Cir.1992). We hold that the Commission's dismissive treatment of NorAm's market center objection, which was hardly a response at all, was not the product of a reasoned decisionmaking process.

For the foregoing reasons, we conclude that FERC has failed to give an adequate explanation for its decision to approve Tennessee's contested offer of settlement. To be clear, we do not suggest that an adequate response to NorAm's market center argument is not possible. We simply hold that the Commission has not yet supplied a reasoned response to the assertion that Tennessee's rate structure would have an anticompetitive impact by inhibiting the development of market centers.

### B.

We turn next to NorAm's contention that the Commission's mishandling of its market center argument "infected its entire decision." In both the order approving the settlement, and the order denying rehearing, the Commission seemed to consider NorAm's market center argument to be separate from its argument about unbundling. In contrast to its meager response to the market center objection, the Commission did give serious attention to (what it perceived to be) NorAm's argument that "systemwide cost-of-services are *per se* unjust and unreasonable." *Order on Contested Settlement,* at 61,359. The Commission endeavored to explain, for example, why it allows pipelines to set rates based on a systemwide cost of service, what it means by a "pay for what you use" policy, etc. The Commission ultimately concluded that Tennessee's rate system did not violate its policies *per se,* and that NorAm had failed to present specific facts demonstrating that Tennessee's rate system would have an anticompetitive impact. *Id.*

**1166**

In this petition for review, NorAm argues that it was a mistake for the Commission to deal with these arguments separately. Tennessee's rate system, we are told, is contrary to Order No. 636, not so much because a system-wide cost of service is inconsistent with the mandatory unbundling policy, but because the combination of production area costs and market area costs has an adverse effect on the development of market centers. As NorAm now puts it, "[t]he reason why a system-wide cost of service rate design and cost allocation is no longer just and reasonable for Tennessee after Order No. 636 is that there is a potential market center on the Tennessee system at Perryville." According to NorAm, when the Commission disregarded its market center argument, it missed the basic message of NorAm's objection to Tennessee's rate structure. "If the Commission had considered [NorAm's] market center argument, the Commission would have found substantial evidence in the record supporting [NorAm's] burden, and showing that the existing Tennessee system-wide rate design and cost allocation mechanisms were inconsistent with Order No. 636." In sum, NorAm contends that the Commission's refusal to deal directly with its market center argument "undermined every part of the Commission's consideration of [NorAm's] position," because the "prohibition on rate structures that inhibit the development of market centers requires the 'unbundling' of capacity upstream of a market center from the capacity downstream of a market center."

Quite apart from the issue of whether the Commission should have considered these arguments separately, it is clear that NorAm is not objecting to Tennessee's rate structure except insofar as it impairs the development of market centers at places like Perryville. Because NorAm's entire argument depends on the effect of Tennessee's system on market centers, and because we have concluded that the Commission did not adequately respond to this point, we need not decide what effect, if any, the mandatory unbundling policy has on rate structures that are based on a system-wide cost of service.

III.

Because the Commission has failed to supply a reasoned response to NorAm's market center objection, the petition for review is granted, and the case is remanded for further proceedings consistent with this opinion.