**LACLEDE GAS COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

**Entex, a Division of Arkla, Inc., et al., Intervenors.**

**No. 92–1002.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 26, 1993.

Decided July 9, 1993.

---

Kenneth J. Neises, Washington, DC, argued the cause for petitioner. With him on

the brief was Jennifer N. Waters, Washington, DC.

Katherine Waldbauer, Atty., Federal Energy Regulatory Com'n ("FERC"), Washington, DC, argued the cause for respondent. With her on the brief were William S. Scherman, Gen. Counsel, FERC, Jerome M. Feit, Sol., FERC and Joseph S. Davies, Deputy Sol., FERC, Washington, DC.

William J. Grealis and Robin M. Nuschler, Washington, DC, were on the joint brief for intervenors City of New Orleans and United Gas Pipe Line Co. Michael W. Tifft, New Orleans, LA, also entered an appearance for intervenor City of New Orleans.

Michael J. Manning and James P. White, Washington, DC, entered appearances for intervenors Louisiana Gas Service Co., Div. of Citizens Utility Co., and Entex, Div. of Arkla, Inc.

Joseph J. DiMona, Peyton G. Bowman, III, Washington, DC, J. Wayne Anderson, and Terrence G. O'Brien, New Orleans, LA, entered appearances for intervenor New Orleans Public Service, Inc.

James H. Byrd and Susan N. Kelly, Washington, DC, entered appearances for intervenor United Mun. Distributors Group.

Fredric J. George, Giles D.H. Snyder, and Stephen J. Small, Charleston, WV, entered appearances for intervenor Columbia Gas Transmission Corp.

F. Nan Wagoner, Judy M. Johnson, and D. Virginia Smith, Houston, TX, entered appearances for intervenor Texas Eastern Transmission Corp.

Before BUCKLEY, SENTELLE, and RANDOLPH,* Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

Concurring opinion filed by Circuit Judge SENTELLE.

---

* Circuit Judge KAREN LeCRAFT HENDERSON, a member of the panel when the case was briefed and argued, found it necessary to recuse herself from further participation in the case. Circuit Judge

BUCKLEY, Circuit Judge:

Laclede Gas Company petitions for review of an order of the Federal Energy Regulatory Commission approving a contested settlement of the remedy phase of an enforcement proceeding against the United Gas Pipe Line Company. Under the settlement, United would refund $19 million to its natural gas customers to compensate them for amounts they were overcharged from 1972 through 1986. We conclude that, although the Commission employed the proper legal standard in evaluating the settlement offer, it failed to provide a reasoned explanation for its decision to approve the settlement.

I. BACKGROUND

Laclede Gas Company is a local distribution company ("LDC") serving the St. Louis metropolitan area. Laclede receives substantially all of its natural gas supplies from Mississippi River Transmission Corporation ("MRT"). From at least 1970 through the mid–1980s, MRT purchased the majority of its gas from United Gas Pipe Line Company ("United"). Accordingly, throughout that period, Laclede was an indirect customer of United.

In 1972, the Federal Power Commission ("FPC"), the predecessor of the Federal Energy Regulatory Commission ("FERC"), established the Purchased Gas Adjustment ("PGA") procedure to reduce the administrative burdens of dealing with rapid fluctuations in the prices that natural gas producers were charging pipelines. See Purchased Gas Cost Adjustment Provision in Natural Gas Pipeline Companies' FPC Gas Tariffs, 47 F.P.C. 1049 (1972). If a PGA clause is incorporated into a pipeline's tariff, the pipeline must make periodic filings with the Commission documenting changes in its purchased gas costs. The pipeline may then pass these changes on to its customers in the form of higher or lower rates without the need for a full-blown rate proceeding under section 4 of the Natural Gas Act ("NGA"), 15 U.S.C. § 717c (1988).

RANDOLPH was drawn by lot to replace her and considered the case on the briefs and tape recording of oral argument.

At the time of the events at issue in the present case, pipelines that adopted the PGA procedure were required to make filings on a semiannual basis. Each PGA filing had two components: a "current adjustment" and a "surcharge adjustment." The current adjustment was a forward-looking projection of what a pipeline's purchased gas costs would be during the next six months. To the extent that actual costs exceeded the projection in the current adjustment, the pipeline would undercharge its customers. Conversely, the pipeline would overcharge its customers if purchased gas costs were lower than projected.

The surcharge adjustment compared what a pipeline actually paid for gas with what it collected from its customers during the previous six-month period. Its purpose was to ensure that a pipeline would recover or pay back, as appropriate, gas costs that were either underrecovered or overrecovered due to inaccuracies in its most recent current adjustment. Thus, if the pipeline overcharged its customers because the prior period's projected costs exceeded actual costs, the difference was deducted from the cost projection for the next six months. Similarly, if the pipeline undercharged its customers because the prior projection failed to cover actual costs, the shortfall was added to the next period's projection. *Cf. Revisions to the Purchased Gas Adjustment Regulations*, 52 Fed.Reg. 43,854, 43,858–59 (1987) (announcing a change to a new system under which pipelines would make comprehensive annual filings including both a current and a surcharge adjustment, and then update the current adjustment with quarterly filings); 18 C.F.R. §§ 154.304–06, 154.308 (1992) (detailing the requirements of the annual and quarterly filings).

United, an intervenor here, filed new tariff sheets in 1972 to adopt the PGA mechanism. In the tariff sheets, United proposed to include in its current adjustment the "rates claimed" by its suppliers, as opposed to the rates actually in effect as of the date of the filing of the tariffs ("rates in effect"). To ensure that this approach would not conflict with the FPC's PGA regulations, United sought a waiver of the regulations to the extent that they might preclude passing through the claimed rates. The FPC, however, denied United's request, ruling that the rates used in computing the current adjustment must be the rates "in effect prior to the effective date of United's PGA rate increase." *See United Gas Pipe Line Co.*, 42 F.E.R.C. ¶ 61,353, at 62,015 (1988); *see also United Gas Pipe Line Co.*, 26 F.E.R.C. ¶ 61,083, at 61,210 (1984).

United then filed a revised PGA tariff, changing the rates claimed language to "suppliers' rates booked by [United] for the month," which United described as those it "believed to be its eventual liability for the gas." *United Gas Pipe Line Co.*, 26 F.E.R.C. ¶ 61,083, at 61,210. The FPC effectively approved this language by accepting United's PGA clause with minor modifications not relevant here. *See United Gas Pipe Line Co.*, 48 F.P.C. 413, 415 (1972). Laclede, however, was not convinced that the new language would effect any substantial change in United's billings and therefore filed a petition for rehearing. *See United Gas Pipe Line Co.*, 26 F.E.R.C. ¶ 61,083, at 61,210. In response to Laclede's petition, the FPC ordered United to amend its tariff sheets to provide that it would compute the amount of its current adjustments "on the basis of the actual rates which are payable to [United's] suppliers as of the effective date of the Current Adjustments." *United Gas Pipe Line Co.*, 48 F.P.C. 749, 750 (1972).

Notwithstanding the FPC's command that only rates in effect could be included in the current adjustment, United included in its PGA filings from June 1972 through March 1986 two types of "unpaid accruals": "accrue-but-don't-pay" amounts and "suspended payables." The former represented United's estimate of what its suppliers might charge it, but which United was not at the time legally required to pay. For example, when United was renegotiating its gas supply contracts at the time it made its PGA filing, it would include in its current adjustment the difference between the price in its current contract and the price it expected to pay under the contract being negotiated. Suspended payables were amounts that United was legally obligated to pay its suppliers for

gas it had already received, but which United was temporarily excused from paying as a result of some legal or other impediment. By including suspended payable amounts in its PGA filings, United was able to collect those amounts from its customers before it paid its suppliers.

Under the surcharge adjustment component of its PGA filings, United eventually refunded to its customers unpaid accruals that were not actually incurred. Nevertheless, United was able to appropriate the time value of money for any overcollections it made, as it did not pay interest for the period it retained the funds. Moreover, beginning in 1979, United assessed its customers carrying charges for unpaid accrual amounts that they failed to pay during the period they were held on United's books.

Ultimately, FERC became aware that several pipelines, including United and El Paso Natural Gas Company ("El Paso"), were systematically overcharging their customers. Accordingly, in 1980, FERC ordered these pipelines to strike all accrued but unpaid gas purchases from their PGA accounts. Both United and El Paso appealed these orders to the Fifth Circuit. The court granted El Paso's petition for review on the grounds that (1) El Paso had agreed to forego collection of interest on unpaid accruals, and (2) FERC had not proved the existence of any overcollections by El Paso. *El Paso Natural Gas Co. v. FERC*, 677 F.2d 22, 24 (5th Cir. 1982). The court noted, however, that the decision was "not binding as to any future disputes concerning the inclusion of unpaid accruals ... in which these same factors are not present." *Id.* In the wake of the *El Paso* decision, FERC requested that United's case be remanded for reconsideration, and the Fifth Circuit granted the request.

On January 23, 1984, FERC issued a show cause order and set for a hearing the question whether United had improperly included unpaid accruals in its PGA filings. *United Gas Pipe Line Co.*, 26 F.E.R.C. ¶ 61,083 (1984). After the hearing, the administrative law judge ("ALJ") assigned to the case held that United had violated both its PGA clause and Commission regulations by including accrue-but-don't-pay amounts and suspended

payables in its surcharge adjustment. *United Gas Pipe Line Co.*, 32 F.E.R.C. ¶ 63,080, at 65,225 (1985). The ALJ determined, however, that United was entitled to include in its current adjustment its "best estimate, reasonably made" of the rates that "would be in effect on the effective date of the Current Adjustment." *Id.* at 65,225–26. Under this ruling, unpaid accruals could be included in a current adjustment "so long as the projection that they would not in fact be unpaid accruals by the effective date of the Current Adjustment was reasonably made." *Id.* at 65,-257.

On appeal, the Commission modified the ALJ's ruling and held that inclusion of unpaid accruals in United's current adjustment, as well as its surcharge adjustment, violated both FERC's PGA regulations and United's own tariff. *See United Gas Pipe Line Co.*, 42 F.E.R.C. ¶ 61,353, at 62,013–16 (1988). According to the Commission, United was required to base its PGA filings on "the rate that the producer has a legal right to charge on the effective date" of the filings, rather than on an estimate of the rate that would ultimately apply. *Id.* at 62,014; *see also id.* at 62,018. As a remedy, the Commission ordered that United refund to its customers (1) the principal of any accrue-but-don't-pay amounts that were improperly collected and had not been returned; (2) the time value of accrue-but-don't-pay amounts that were collected prematurely by being included in United's current and surcharge adjustments; (3) the time value of suspended payables collected through United's surcharge adjustments; and (4) carrying charges related to the unpaid accruals, along with the time value of those charges. *See id.* at 62,023–25.

FERC recognized that the process of calculating the refund amounts would be extremely difficult. Indeed, the Commission observed that "requiring United to track each and every 'Accrue–But–Don't–Pay' and 'Suspended Payable' amount that has been included in its PGA rates since the inception of its PGA clause would be onerous and perhaps impossible." *Id.* at 62,024. The Commission, however, did outline an approach to making remedial calculations, *see id.* at 62,024–25, and remanded the case to

the ALJ to implement the approach "if a settlement cannot be reached." *Id.* at 62,-025–26.

United responded to FERC's ruling by filing a request for rehearing. In an order issued on June 3, 1988, the Commission denied the request. *See United Gas Pipe Line Co.*, 43 F.E.R.C. ¶ 61,441, at 62,104 (1988). The Commission emphasized, however, that its suggested approach to making remedial calculations was not designed to foreclose the option of settlement by the parties. According to the Commission, "there was no intent to prejudge any reasonable settlement methodology of the parties' own devising—or even a lump-sum agreement that avoids the administrative burden of making the remedial calculations entirely." *Id.* at 62,101.

On remand, United contended that it owed its customers $928,691. *United Gas Pipe Line Co.*, 50 F.E.R.C. ¶ 63,006, at 65,008 (1990). Both United's customers and FERC's Enforcement Staff ("Enforcement") challenged this estimate, arguing that the methodology on which it was based was flawed in a number of respects. Enforcement proposed an alternative methodology that set the refund at $32 million. *Id.* at 65,009.

On January 24, 1990, the ALJ issued an initial decision in which he concluded that United's methodology was improper, and adopted a methodology similar to the one proposed by Enforcement. *See generally id.* The ALJ ordered United to recompute the amount owed in accordance with his rulings and to file the recomputation within 75 days. *Id.* at 65,027. This order, however, was stayed pending United's appeal to the Commission. *See United Gas Pipe Line Co.*, 50 F.E.R.C. ¶ 61,443 (1990).

From mid–1990 through early 1991, while United's appeal was pending, United made several unilateral offers of settlement that were opposed by both its customers and Enforcement. Underlying the failure to agree was the fact that the parties differed widely on the amount of refunds United owed. In January 1991, however, United entered into negotiations with several of its customers that were simultaneously challenging United's rates in separate proceedings: Entex,

Inc., a LDC serving Houston, Texas; New Orleans Public Service, Inc.; and Louisiana Gas Service Co. (collectively, "the southern LDCs"). Neither Laclede nor Enforcement was invited to participate in these negotiations, although United appears to have consulted with Enforcement during the later stages of the talks. The negotiations culminated in a joint offer of settlement that was filed by United and the southern LDCs on April 24, 1991. Under this offer, United would refund to its customers $19 million over a period of almost five years. The offer was supported by the Louisiana Public Service Commission and MRT, but it was opposed by Laclede, Enforcement, and Southern Natural Gas Company. In its comments opposing the settlement, Enforcement contended that the offer was inadequate because United's liability was properly estimated at $53.3 million under the methodology approved by the ALJ.

On June 20, 1991, FERC issued an order in which it approved the joint settlement offer. *United Gas Pipe Line Co.*, 55 F.E.R.C. ¶ 61,456 (1991). According to the Commission, "[i]n view of all the circumstances ... the payments provided for in [the joint settlement offer] constitute a fair and reasonable remedy." *Id.* at 62,470. The Commission supplied four reasons to support this conclusion. First, the Commission observed that if the settlement was not approved, the litigation could stretch on for a significant period of time. In FERC's view, because the ALJ did not fix the amount of the refund—he merely established a methodology for making calculations—"[t]he day of final resolution, in the absence of a settlement, [was] still over the horizon," even if the Commission were to accept the ALJ's decision. *Id.* Second, FERC claimed that the settlement offer "is supported or unopposed by parties representing 90 percent of the refunds." *Id.* Third, the Commission noted that the joint settlement, as an "entirely cash offer," was an improvement on United's previous settlement offers, "which consisted primarily of non-cash concessions." *Id.* Finally, the Commission determined that the settlement offer "refunds an amount of money within the expected range of recovery." *Id.*

In response to FERC's order, Laclede filed a request for rehearing. As an initial matter, Laclede challenged the legal standard that FERC applied in evaluating the settlement. In particular, Laclede pointed to the following regulation, known as Rule 602, regarding the acceptance of settlement offers:

> (g) *Uncontested offers of settlement.*
>
> \* \* \* \* \* \*
>
> (3) An uncontested offer of settlement may be approved by the Commission upon a finding that the settlement appears to be fair and reasonable and in the public interest.
>
> (h) *Contested offers of settlement.* (1)(i) If the Commission determines that any offer of settlement is contested in whole or in part, by any party, the Commission may decide the merits of the contested settlement issues, if the record contains substantial evidence upon which to base a reasoned decision or the Commission determines there is no genuine issue of material fact.
>
> (ii) If the Commission finds that the record lacks substantial evidence or that the contested issues can not be severed from the offer of settlement, the Commission will:
>
> > (A) Establish procedures for the purpose of receiving additional evidence before a presiding officer upon which a decision on the contested issues may reasonably be based; or
> >
> > (B) Take other action which the Commission determines to be appropriate.
>
> (iii) If contested issues are severable, the uncontested portions may be severed and decided in accordance with paragraph (g) of this section.

18 C.F.R. § 385.602(g), (h) (1992). Laclede argued that FERC had improperly applied the Rule 602(g) standard for uncontested settlements by approving the joint settlement on the ground that it was "fair and reasonable." Laclede claimed that review should have been conducted under Rule 602(h), which in its view required FERC to rule on the merits of whether the terms of the settlement were "just and reasonable" within the meaning of section 4 of the NGA.

In addition to challenging the legal standard FERC applied, Laclede also contested the reasons given by FERC to support its approval of the settlement. Specifically, Laclede questioned FERC's view that "[t]he day of final resolution, in the absence of a settlement, is still over the horizon." According to Laclede, once FERC ruled on United's exceptions to the ALJ's order, the task of recomputing United's liability was purely "ministerial," so that the "day of final resolution" was "on the Commission's doorstep." Joint Appendix ("J.A") at 284–85. Laclede further contended that FERC had overestimated the extent of the support for the settlement among United's customers. In its view, the 90 percent figure cited in the Commission's decision could not be correct because Laclede itself was entitled to roughly 13 percent of the refunds; and, in any event, Laclede claimed that the extent of support for the settlement was "largely irrelevant" in determining whether the settlement should be adopted. *Id.* at 288. Finally, Laclede maintained that the remaining arguments advanced by the Commission to justify its decision were "not the product of reasoned decisionmaking." *Id.* at 289.

On November 6, 1991, FERC issued an order denying Laclede's rehearing request. *United Gas Pipe Line Co.,* 57 F.E.R.C. ¶ 61,-161 (1991). In the order, FERC responded to each of the objections raised by Laclede. At the outset, FERC agreed that the "fair and reasonable" standard "is not applicable to contested settlements." *Id.* at 61,583. FERC asserted, however, that "the June 20, 1990 order is not somehow invalidated because it refers to the payments to be made under the contested settlement as a fair and reasonable remedy." *Id.* Rather, the Commission maintained that

> [t]he issue presented by United's offer of settlement was whether, under all of the circumstances, the remedy proposed in the settlement offer was reasonable and appropriate. This is not a factual issue, but a matter of policy or judgment to be resolved in view of the totality of circumstances.

*Id.* FERC then claimed that the $19 million settlement was entitled to stand as "an appropriate remedy under the circumstances." *Id.*

Turning to Laclede's argument that FERC had inaccurately assessed and improperly relied upon the support of United's customers for the settlement, the Commission appeared to back away from its earlier position. According to the Commission, "[t]here is no point in resolving disputes over the exact number of supporters and nonsupporters of the settlement, or the percentage of refunds each group represents." *Id.* Instead, the Commission emphasized that "[t]here is no requirement that there be unanimous support, or some specific level of support, of participating parties before a contested settlement may be approved." *Id.*

Next, the Commission rejected Laclede's contention that a decision on the merits of the ALJ's decision would "leave only 'ministerial' duties." *Id.* In the Commission's view, it was "entirely unrealistic to expect that, had the Commission issued an order resolving all of the issues concerning the recomputation model, United's compliance with that order would be accepted without further dispute." *Id.*

Lastly, FERC observed that the settlement was consistent with statements in its earlier orders that encouraged a settlement concerning the extent of United's liability. *Id.* at 61,583–84. The Commission claimed that it

> foresaw that resolution by settlement would be attempted and that, consequently, a refund of less than the amount obtained by recomputing United's PGA filings would be proffered. The Commission encouraged settlement negotiations so the customers would be assured of some reasonable recovery. United's offer of $19 million plus interest assures the customers of that recovery.

*Id.* at 61,584.

In response to the denial of its rehearing request, Laclede filed a timely petition for review in this court pursuant to section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b).

## II. DISCUSSION

In its petition for review, Laclede renews its arguments that (1) FERC failed to apply the proper legal standard in evaluating the joint settlement offer, and (2) the reasons provided to support FERC's acceptance of the settlement are inadequate. We agree with the latter contention, but not the former.

### A. Rule 602(h)

Laclede argues that the language in Rule 602(h) stating that FERC "may decide the merits of the contested settlement issues" imposed an obligation on the Commission to ensure that the refunds provided by the settlement closely matched the amounts by which United overcharged its customers. Laclede claims that FERC failed to satisfy this requirement in either its order approving the joint settlement offer or its order denying rehearing.

In response, FERC claims that Rule 602(h) requires only that "the Commission must decide the merits of the contested issue in the same way it would have absent the settlement." FERC Br. at 15. FERC then argues that one must distinguish between the settlement of "a typical fact-oriented issue such as the appropriate rate of return for a company" and a settlement designed to provide a remedy in an enforcement proceeding. *See id.* at 23. Because assigning a remedy is a "discretionary issue" that calls for "an essentially judgmental determination," FERC maintains that it was not required to match refunds with the losses experienced by United's customers. *See id.* at 23–24. Instead, FERC contends that the strictures of Rule 602(h) were satisfied so long as it "reasonably exercise[d] its discretion in light of the totality of the circumstances." *Id.* at 24.

In evaluating the competing arguments over the import of Rule 602(h), we are cognizant of the fundamental principle that "an agency's construction of its own regulations is entitled to substantial deference," *Martin v. Occupational Safety & Health Review Comm'n,* 499 U.S. 144, ——, 111 S.Ct. 1171, 1175, 113 L.Ed.2d 117 (1991) (quoting *Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333,

2341, 90 L.Ed.2d 921 (1986)), and must be given effect "so long as it is reasonable," *id.* 499 U.S. at ——, 111 S.Ct. at 1176 (quoting *Ehlert v. United States,* 402 U.S. 99, 105, 91 S.Ct. 1319, 1323, 28 L.Ed.2d 625 (1971)) (internal quotation marks omitted). *See also Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–802, 13 L.Ed.2d 616 (1965); *Sandstone Resources, Inc. v. FERC,* 973 F.2d 956, 959 (D.C.Cir.1992). As we find FERC's interpretation of Rule 602(h) reasonable, we conclude that the Commission was not obliged to scrutinize the joint settlement offer to ensure that it provided dollar-for-dollar refunds to United's customers.

■ It is well established that there is a fundamental difference between FERC's role in ratemaking proceedings and its role in assigning remedies to redress violations of the NGA. In the ratemaking context, FERC must ensure that "[a]ll rates and charges made, demanded, or received by any natural-gas company for or in connection with the transportation or sale of natural gas . . . shall be just and reasonable." 15 U.S.C. § 717c(a). By contrast, FERC enjoys a great deal of flexibility in the remedy phase of an enforcement proceeding. Indeed, as we have often noted, FERC's discretion is "at [its] zenith when the action assailed relates primarily . . . to the fashioning of . . . remedies and sanctions." *Niagara Mohawk Power Corp. v. FPC,* 379 F.2d 153, 159 (D.C.Cir.1967); *see also Consolidated Gas Transmission Corp. v. FERC,* 771 F.2d 1536, 1549 (D.C.Cir.1985); *Columbia Gas Transmission Corp. v. FERC,* 750 F.2d 105, 109 (D.C.Cir.1984).

■ With reference to refunds, FERC's authority to order them is derived from section 16 of the NGA, which provides that FERC may take actions that are "necessary or appropriate to carry out the provisions" of the Act, 15 U.S.C. § 717o. *See Consolidated Gas,* 771 F.2d at 1550–51. This provision in no way qualifies as a statutory command that refunds be ordered whenever overcharges have been identified, and FERC may in some situations decline to order any refund at all. *See Towns of Concord, Norwood & Wellesley, Mass. v. FERC,* 955 F.2d 67, 72–75 (D.C.Cir. 1992) (examining FERC's remedial authority

and discretion under the Federal Power Act). In determining whether to require a refund, and by implication in setting the amount, FERC need only establish that its decision constitutes a "reasonable accommodation" of the "relevant factors," *id.* at 76 (quoting *Las Cruces TV Cable v. FCC,* 645 F.2d 1041, 1047 (D.C.Cir.1981)), and that the remedy provided is "equitable in the circumstances," *id.* (quoting *Wisconsin Elec. Power Co. v. FERC,* 602 F.2d 452, 457 (D.C.Cir.1979)).

■ In our view, Rule 602(h) is properly read to accommodate the difference in the standards applied in ratemaking and remedial proceedings. Unlike Rule 602(g), which states that uncontested settlements may be accepted if they are "fair and reasonable," 18 C.F.R. § 385.602(g)(3), Rule 602(h) contains no substantive standard. It merely states that FERC "may decide the merits of the contested settlement issues, if the record contains substantial evidence . . . or the Commission determines there is no genuine issue of material fact." *Id.* § 385.602(h)(1)(i). As noted above, however, "decid[ing] the merits of the contested . . . issues" calls for a different type of inquiry in the remedial context than in a ratemaking proceeding.

Moreover, Rule 602(h) effectively codifies the principles articulated in *Mobil Oil Corp. v. FPC,* 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974), in which the Supreme Court held that the FPC not only had the power to consider contested settlement offers, but was in fact obliged to do so. *See id.* at 312, 94 S.Ct. at 2347. The underlying theory of the *Mobil Oil* decision is that when the Commission approves a contested settlement, it is effectively adopting that settlement as its own independent resolution of the matter at issue. *See id.* at 313–14, 94 S.Ct. at 2348–49. This being the case, FERC should not be held to a more demanding standard in accepting a remedial settlement than it would be if it imposed precisely the same terms on its own initiative.

Given our conclusion that Rule 602(h) incorporates the substantive standard that is generally applied in devising remedies, we find no fault with FERC's statement of that standard. In its order denying rehearing,

FERC declared that "[t]he issue presented by United's offer of settlement was whether, under all of the circumstances, the remedy proposed in the settlement offer was reasonable and appropriate." *United Gas Pipe Line Co.*, 57 F.E.R.C. ¶ 61,161, at 61,583. This statement acceptably paraphrases the requirement that a remedy must represent a "reasonable accommodation" of the "relevant factors," and be "equitable in the circumstances." *Towns of Concord, Norwood & Wellesley*, 955 F.2d at 76.

**B. The Adequacy of FERC's Explanation**

▉ While Rule 602(h) does not impose a heightened substantive standard for approval of remedial settlements, it does indicate that FERC's acceptance of the settlement offer must constitute a "reasoned decision" supported by "substantial evidence." 18 C.F.R. § 385.602(h)(1)(i). FERC's action is also subject to the requirements of the Administrative Procedure Act ("APA"), which provides that a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In implementing the APA's mandate, we have stated that "[a]s a general proposition, we will not second-guess FERC judgments on remedies and sanctions developed pursuant to proceedings before the Commission." *Office of Consumers' Counsel, Ohio v. FERC*, 783 F.2d 206, 233 (D.C.Cir. 1986) ("*OCC*"). This reflects the fact that agency decisions concerning the proper remedy to be applied "frequently rest upon a complex and hard-to-review mix of considerations." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 621, 86 S.Ct. 1018, 1027, 16 L.Ed.2d 131 (1966). Nevertheless, "even the Commission's broad discretion is bounded by the limits of its authority and the necessity for rational decisionmaking." *OCC*, 783 F.2d at 234; *see also Columbia Gas*, 750 F.2d at 109 (stating that FERC's remedial orders must have "a rational basis"). We find that FERC has transgressed these bounds in the instant case because it has failed to provide an adequate explanation for its decision to approve the settlement.

In defending its action on appeal, FERC advances the same grounds on which it relied in approving the United settlement: (1) the Commission had urged the parties to settle; (2) of United's approximately 140 customers, only Laclede continued to oppose the settlement by the conclusion of the proceedings below; (3) United's latest offer was superior to its previous offers; (4) settling the case avoided the need for extended proceedings to determine precisely how much United owed; and (5) the settlement amount was within the expected range of recovery. *See* FERC Br. at 19–22. To these justifications, FERC adds that it was rational to approve the $19 million settlement because United is experiencing "severe financial difficulties" and presumably cannot afford to refund a larger amount. *Id.* at 20 & n. 4.

▉ At the outset, we reject FERC's attempt to bolster its case on appeal by relying on United's alleged financial difficulties. Under well-established principles, a Commission order "must stand or fall on the grounds articulated by the agency" in that order, *Algonquin Gas Transmission Co. v. FERC*, 948 F.2d 1305, 1312 n. 12 (D.C.Cir.1991) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)), and the Commission did not refer to United's financial problems in either the order approving the settlement or the one denying Laclede's rehearing request.

▉ We may also dismiss summarily the argument that the settlement should be upheld merely because FERC had identified this case as "an appropriate candidate for settlement." FERC Br. at 22. This demonstrates only that FERC thought that settlement offered a reasonable alternative to complex litigation. It does not show that it would be rational to approve any settlement the parties might reach, as FERC itself appeared to recognize in its initial rehearing order. *See United Gas Pipe Line Co.*, 43 F.E.R.C. ¶ 61,441, at 62,101 (explaining that FERC's prior opinion ordering United to refund the amounts it had improperly collected from its customers did not "prejudge any *reasonable* settlement methodology of the parties' own devising—or even a lump-sum agreement that avoids the administrative

burden of making the remedial calculations entirely") (emphasis added). Indeed, we have squarely rejected the notion that any settlement, solely because of its status as such, is reasonable. *See Tejas Power Corp. v. FERC,* 908 F.2d 998, 1003 (D.C.Cir.1990) ("[T]hat the proposal is a settlement does not 'establish without more the justness and reasonableness of its terms.'") (quoting *Mobil Oil,* 417 U.S. at 312–13, 94 S.Ct. at 2348).

■ Of the justifications that remain, several represent considerations that FERC may properly take into account in evaluating remedial settlement offers, but which are not sufficient, either by themselves or collectively, to uphold the settlement. For example, the Commission may accord some weight to the fact that the bulk of United's customers either supported or elected not to oppose the settlement offer. *See id.* Even when customer support is unanimous, however, FERC retains the responsibility of making an "independent judgment" as to whether the settlement amount constitutes a reasonable remedy. *Id.*

Moreover, for two reasons, a mere "headcount" of those supporting and opposing United's settlement offer may have been an unreliable indicator of the reasonableness of that proposal. First, the history of the settlement negotiations suggests that some of the parties supporting the settlement might have done so to obtain concessions on issues unrelated to the unpaid accruals. The negotiations leading to United's final settlement offer began in earnest only after a new challenge had been filed to United's rates in late 1990 and after United, in December 1990, made a unilateral "non-severable" offer of settlement covering the rate issues, the allocation of certain take-or-pay costs, and the unpaid accruals. *See J.A.* at 293–315. United followed its December 1990 offer with a second comprehensive proposal that was submitted on January 15, 1991. *See id.* at 316–65. It then entered negotiations with the southern LDCs that excluded both Laclede and Enforcement. During these negotiations, Entex, one of the southern LDCs, requested that FERC postpone its scheduled consideration of the ALJ's methodology because a Commission decision regarding the

unpaid accruals remedy "could make reaching settlement on rate and service issues more difficult." *Id.* at 366–67. As noted above, the negotiations eventually resulted in the April 1991 joint settlement offer that received the Commission's approval.

In light of this history, it is conceivable that the support of the southern LDCs for the unpaid accruals settlement was linked to concessions by United on rate and service issues or the allocation of take-or-pay costs. Such concessions, however, would be of little value to Laclede, as Laclede no longer purchases gas from United. In addition, the fact that Laclede was excluded from the negotiations and vigorously opposed the settlement might well counsel against attributing undue weight to the number of parties supporting United's proposal. To be sure, there is no requirement that a pipeline must negotiate with every one of its customers before submitting a settlement offer. Still, Laclede was owed the largest share of the refund (13 percent) and presumably had the greatest monetary incentive to scrutinize the settlement for fairness.

Second, and more broadly, the customers that supported or failed to oppose the United settlement are, like Laclede, LDCs that are subject to rate regulation by state and local utility commissions. As we observed in *Tejas Power Corp. v. FERC,* such LDCs "might not have a sufficient incentive, in dealing with [a] pipeline, to minimize their costs." 908 F.2d at 1003. Accordingly, "neither the Commission nor we may merely assume, without analysis, that the LDCs' protection of their own interests ... will inure to the benefit of consumers." *Id.* Instead, "the Commission must, at a minimum, address the question of whether the LDCs' interests are sufficiently likely to be congruent with those of ultimate consumers that it may rely upon the LDCs' agreement as dispositive of the consumers' interests...." *Id.* at 1004. In the present case, FERC made no such inquiry.

■ FERC's observation that under the approved settlement United would pay a larger amount in refunds than it had previously offered is similarly insufficient to justify the Commission's action. The superiority

of United's final settlement offer over the ones that preceded it may be of little significance if the prior offers were wholly inadequate. Put differently, the increase in value to United's customers in the final offer demonstrates not that the final offer was reasonable, but only that it was less unreasonable than its predecessors.

Because the last two justifications—avoidance of protracted litigation and the presence of a settlement amount "within the expected range of recovery"—are related in this case, we discuss them together. In the Commission's view, the difficulties attendant on determining the precise amount of the refunds both justify the settlement as an alternative to protracted proceedings and support the reasonableness of approving a settlement figure that falls somewhere near the middle of a rather large range of estimates of United's liability.

It is, of course, perfectly appropriate for FERC to weigh the prospects for protracted litigation in determining whether a remedial settlement offer should be accepted. *Cf. Towns of Concord, Norwood & Wellesley*, 955 F.2d at 76 (indicating that FERC was entitled to consider "the time and expense involved in trying to reconstruct the amount" of past overcharges in deciding whether to order a refund remedy). But the Commission must indicate why the interest in avoiding lengthy and difficult proceedings warrants acceptance of this particular settlement.

FERC's confidence in the reasonableness of the settlement amount appears to rest primarily on the observations that (1) the $19 million refund "is much less than what [the] Enforcement Staff argues for, but much more than United has conceded it owes," 55 F.E.R.C. ¶ 61,456, at 62,470; and (2) Enforcement's high-end estimate, which was based on the ALJ's proposed methodology, would prove accurate only if all of the outstanding issues were resolved against United, *see id.* Turning to the first of these two rationales, the mere fact that the settlement figure fell somewhere within the vast gulf between United's estimate of its own liability (approximately $1 million) and the alternative advanced by Enforcement (approximately $53 million by the time of the order denying rehearing) provides scant support for the Commission's decision. As an initial matter, it is entirely possible that the preliminary liability estimate of a party in United's position might reflect a strategy designed to strengthen its position in the ensuing settlement negotiations or litigation. More importantly, relying solely on such estimates would lead to the untenable result that if United initially estimated its liability at one dollar, a settlement of a penny more would be "within the expected range of recovery."

Thus, FERC's approval of the settlement appears to rest heavily on its view that at least some aspects of the ALJ's methodology were likely to be rejected in the course of protracted litigation, the avoidance of which justified a settlement that roughly split the difference between the amounts the contending parties claimed to be payable. Unfortunately, it is here that the critical problem lies. In its orders, FERC failed to conduct *any* meaningful review of the objections to the ALJ's methodology. Instead, FERC merely observed that

> [t]hough the record is replete with parties' various estimates of the amount of refunds which would result from application of the recomputation model as provided by United or as modified by the [ALJ], there has been no final determination as to the amount of refunds due or the proper method of determining such amount. Many of the [ALJ]'s conclusions are strongly contested. Only if all issues were found against United (both by the Commission and the courts) would the amount be as high as some parties have estimated. And many issues raised in this proceeding are of first impression for which there are no Commission or court precedents.

*Id.*

These perfunctory assertions fall short of an explanation of why the problems with the ALJ's decision were of a magnitude that justified FERC's approval of the $19 million settlement amount. Indeed, the number of objections raised and the vigor with which they were urged say little, if anything, about the quality of those objections. As for the novelty of the questions presented in the

refund proceeding, this might suggest a higher-than-usual probability of reversal, but further elaboration is required.

In view of the foregoing, we find that FERC has failed to provide an adequate explanation for its decision to approve the joint settlement offer. We do not wish to be understood as holding that no rational justification for the settlement is possible. But we do insist that if FERC is to approve the settlement, it must support that decision with sufficient attention to the issues raised regarding the ALJ's methodology, their potential impact on the value of the refunds owed, and the burden posed by further litigation to justify the conclusions that the settlement is equitable and hence that its approval constitutes a reasonable exercise of the Commission's remedial discretion.

### III. CONCLUSION

Because FERC has not supplied a reasoned explanation to justify its approval of the joint settlement offer, the petition for review is granted, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

SENTELLE, Circuit Judge, concurring:

While I am in general agreement with the majority's reasoning and result, I do not share its conclusion that FERC applied the correct standard in approving the contested settlement. Commission Rule 602, 18 C.F.R. § 385.602 (1991), provides, in pertinent part, that "[a]n uncontested offer of settlement may be approved by the Commission upon a finding that the settlement appears to be fair and reasonable and in the public interest." 18 C.F.R. § 385.602(g)(3) (1991). Also, in partially contested settlements, if the uncontested and contested issues are severable, "the uncontested portions may be severed and decided" as an uncontested settlement. 18 C.F.R. § 385.602(h)(1)(iii).

As to contested settlements, such as the United settlement, FERC "may decide the merits of the contested settlement issues, if the record contains substantial evidence upon which to base a reasoned decision or the Commission determines there is no genuine issue of material fact." 18 C.F.R. § 385.-602(h)(1)(i). However:

If the Commission finds that the record lacks substantial evidence or that the contested issues can not be severed from the offer of settlement, the Commission will:

(A) Establish procedures for the purpose of receiving additional evidence before a presiding officer ...; or

(B) Take other action which the Commission determines to be appropriate.

18 C.F.R. § 385.602(h)(1)(ii).

Laclede's argument that in approving the contested United settlement FERC erroneously applied the "fair and reasonable" standard that governs uncontested settlements appears correct to me. FERC's order denying rehearing recognized that "Laclede is correct that a finding that the settlement appears to be 'fair and reasonable' is a requirement ... for approving an uncontested settlement, but is not applicable to contested settlements." *United Gas Pipe Line Co.,* 57 Fed.Energy Reg.Comm'n Rep. (CCH) ¶ 61,-161, at 61,583 (1991). Nonetheless, FERC ruled (and argues on appeal) that in reviewing a contested settlement under Rule 602(h), the issue presented is "whether, under all of the circumstances, the remedy proposed in the settlement offer was reasonable and appropriate," an issue which FERC views as "not a factual issue, but matter of policy or judgment." *Id.*

Mindful that we must give an agency's interpretation of its own regulation "controlling weight" unless it is "plainly erroneous or inconsistent with the regulation," *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945); *see also TransCanada Pipelines Ltd. v. FERC,* 878 F.2d 401, 411 (D.C.Cir.1989) (same), I would nonetheless reject FERC's interpretation of Rule 602(h). First, I cannot accept FERC's contention that whether a contested settlement should be approved presents only a policy matter for FERC's determination. Quite plainly, such a settlement presents FERC with, in the language of Rule 602(h), a question of "evidence" or "fact"—whether it appears, by substantial evidence in the rec-

ord, that approving the settlement proposal will establish just and reasonable rates. *See Mobil Oil Corp. v. FPC,* 417 U.S. 283, 313, 94 S.Ct. 2328, 2348 (1974). That is why, for example, Rule 602(h) commands FERC to rule on contested settlements on the basis of "substantial evidence," except where "there is no genuine issue of material fact," 18 C.F.R. § 385.602(h)(1)(i), and, *inter alia,* to "[e]stablish procedures for the purpose of receiving additional evidence ... upon which a decision on the contested issues may reasonably be based." 18 C.F.R. § 385.-602(h)(1)(ii)(A). Thus, FERC's interpretation of Rule 602(h) to present only policy issues in reviewing contested settlements is contrary to the plain meaning of the rule.

Moreover, I fail to see how FERC's suggested "reasonable and appropriate" standard differs substantively from the "fair and reasonable" standard governing uncontested settlements. Both standards suggest that FERC will only cursorily review the reasonableness of proposed settlements; indeed, the fact that FERC concluded, in scarcely more than one page of analysis, that the United settlement was "reasonable and appropriate" highlights the superficial nature of FERC's scrutiny of the settlement. *See United Gas Pipe Line Co.,* 57 Fed.Energy Reg.Comm'n Rep. (CCH) at 61,583. While such limited scrutiny is appropriate when the settlement is uncontested, the presence of a challenge to the settlement "triggers the Commission's obligation, under § 7 of the NGA and § 385.602(h)(1)(i) of its rules, to examine the potential impact of the [settlement] upon the[ ] [challenger's] interests and to support its conclusions with substantial evidence." *Tejas Power Corp. v. FERC,* 908 F.2d 998, 1003 (D.C.Cir.1990); *see also id.* (holding that Rule 602 "provide[s] that [FERC] may approve a contested settlement ... only if 'the record contains substantial evidence upon which to base a reasoned decision or the Commission determines there is no genuine issue of material fact'") (quoting 18 C.F.R. § 385.602(h)(1)(i)). In view of *Tejas Power,* I would hold that FERC's interpretation of Rule 602(h) is plainly erroneous and inconsistent with the language of the rule.